AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Nicu Buzatu | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

Case No.    4:26-mj-70846 MAG

**FILED**

JUN 16 2026
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 1, 2026_____ in the county of _____Alameda_____ in the _____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Unauthorized Use of Access Device |

This criminal complaint is based on these facts:

Please see the attached affidavit of DSS Special Agent Taylor Frechette

☑ Continued on the attached sheet.

/s/ Taylor Frechette
*Complainant's signature*

DSS Special Agent Taylor Frechette
*Printed name and title*

Approved as to form  /s/ Emily R. Dahlke
AUSA  Emily R. Dahlke

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    06/16/2026

*Judge's signature*

City and state:    McKinleyville, California        Hon. Robert M. Illman, U.S. Magistrate Judge
*Printed name and title*

**<u>AFFIDAVIT OF SPECIAL AGENT TAYLOR FRECHETTE</u>**
**<u>IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT</u>**

I, Taylor Frechette, Special Agent with the U.S. Department of State, Diplomatic Security Service (DSS), being duly sworn, do declare and state the following:

**<u>INTRODUCTION</u>**

1.      This affidavit is made in support of a Criminal Complaint charging Nicu Buzatu with a violation of Title 18, U.S. Code, Section 1029 (a)(2) (Fraud and Related Activity in Connection with Access Devices), in the Northern District of California on January 1, 2026.

2.      Because this Affidavit is submitted for the limited purpose of obtaining a criminal complaint and arrest warrant for **BUZATU**, I have not included each and every fact known to me about this case.  Rather, I have set forth only the facts that I believe are necessary to establish probable cause that the violations of the federal law identified above have occurred.

3.      I have based my statements in this affidavit on my training and experience, my personal knowledge of the facts and circumstances obtained through my participation in this investigation, interviews with witnesses, information obtained from other law enforcement officers, information provided by reports prepared by other agents and law enforcement officers, information provided by records and databases, and my review of records relating to this investigation, all of which I believe to be reliable.  As the investigation continues, my understanding of the events described herein may change and evolve depending on additional information learned about the facts and circumstances.

4.      Where statements made by other individuals (including other law enforcement officers and witnesses) are referenced in this affidavit, such statements are described in sum and substance and in relevant part.  Similarly, where information contained in reports and other

1

documents or records are referenced in this affidavit, such information is also described in sum and substance and in relevant part.

## AFFIANT BACKGROUND

5.      I am a Special Agent with the U.S. Department of State, Diplomatic Security Service ("DSS") assigned to the San Francisco Field Office and have been so employed since 2018.  My training included completing the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and the Basic Special Agent Course at the Diplomatic Security Training Center.  I am assigned as a Task Force Officer ("TFO") the San Francisco Field Office of the Federal Bureau of Investigation Transnational Organized Crime squad.  As a DSS Special Agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. I have participated in investigations of passport fraud, money laundering, conspiracy, theft, identity theft, and fraudulent documents. I have conducted and participated in physical and electronic surveillance and the execution of search warrants.  Through my training, education, and experience, I have become familiar with the way individuals impersonate and assume other identities and/or personas in order to commit fraud; forge, alter, and misrepresent documents to falsely present themselves; and conceal fruits of their crimes. Prior to my current position as a Special Agent with the DSS I served as an Intelligence Officer in the United States Army.

6.      While acting in my official capacity, I am authorized to investigate violations of the laws of the United States.  I have attended law enforcement trainings and have worked with other experienced fraud investigations and forensic analysis law enforcement personnel who investigate and/or participate in investigations of financial crimes, including conducting

surveillance, executing search warrants, and reviewing digital evidence containing numerous examples of offenses involving identity theft, money laundering, wire fraud, and access device fraud.  I have participated in numerous criminal and national security investigations to include the execution of search and arrest warrants.

7.   I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations, to execute search warrants, and to make arrests for violations of Federal law enumerated in 18 U.S.C. § 2516, including for violations of Title 18, United States Code Section 1029(a)(2), Access Device Fraud..

<b><u>APPLICABLE LAW</u></b>

8.     Title 18, United States Code, Section 1029(a)(2) makes it illegal for a person to knowingly use or traffic in an unauthorized access device and, with the intent to defraud, obtain at any time during a one-year period anything of value worth $l,000 or more, or things of value, their value together totaling $1,000 or more, when that conduct affects in some way commerce between one state and another state, or between a state of the United States and a foreign country

<b><u>FACTS ESTABLISHING PROBABLE CAUSE</u></b>

<b><u>Overview of Illegal Skimming Activities Associated with Access Device Fraud</u></b>

9.     ATM and Point of Sale ("POS") skimming involves the surreptitious placement of an electronic device that has the capabilities of reading and capturing the account information stored on a magnetic strip of a plastic bank card or debit card.  In the case of a POS skimming, the skimming device is typically an overlay designed to replicate the appearance of the genuine POS terminal, which is then placed on top of a POS terminal at a retail establishment. In the case of ATM skimming, the skimming device, often referred to as a "deep-insert skimmer" is

3

typically inserted inside of the ATM card acceptor slot utilizing a shim in such a fashion as to make it undetectable to the ATM customer. In both cases, the skimming devices have internal memory to store the information on the victim card's magnetic strip.

10.     In the case of ATM skimming, a secondary device is typically used to capture the unsuspecting account holder's personal identification number (PIN) via a micro digital camera focused on the PIN pad of the ATM. These are referred to as "pinhole" cameras. The pinhole cameras are frequently placed inside concealments designed to mimic the signage or other casement materials around the ATM. The POS skimming overlays typically have the capability to capture both the magnetic strip data and the user's PIN in one device.

11.     After the skimming devices are installed, the suspects return to recover the devices, which at that point contain the full account information from the victims' bank cards, and the associated PINs.  The skimming devices are then connected to a computer or mobile device to download the captured account information, PIN numbers and/or video of the PINs. The suspects then utilize a card reader/writer device connected to a laptop computer or similar electronic device to encode the stolen account information onto the magnetic strip of other cards with magnetic strips. From my training and experience, I know that individuals engaged in skimming operations will often utilize gift cards or reloadable debit cards with no value as card stock, and then encode the victim's account information on the magnetic strips on these cards. These reencoded cards are known as "clone cards." The PIN associated with a respective victim card is typically written on the plastic card or on a sticker affixed to the plastic card, at which point they are ready be used at any ATM to withdraw the victim's benefit funds. The withdrawal phase of a skimming operation is typically referred to as a "cash-out".

4

12.    ATM/POS skimming devices are often used more than once, and the criminals who use them often do so at more than one location at a time.  Prior to use or when not in use, the ATM/POS skimming equipment typically is stored in the location where the criminals are residing, within their vehicles or in storage units under their control.

13.    I know from my training and experience that skimming schemes often target pre-paid public benefits cards issued by a bank on behalf of a state agency because these cards are sometimes issued without a security chip, making them easier to exploit than chip-protected debit cards. These benefits are often referred to as Electronic Benefit Transfer (EBT) funds.

14.    I know from my experience that California EBT funds are typically dispersed on the first, second, and third day of the month. The funds are made available to recipients to withdraw (including from ATMs) beginning at 6:00 a.m. on each of these days. Because of this, illegal cash-out operations, like those described above, typically occur at ATMs in the early morning hours of the first day of the month because the individuals who participate in EBT access device fraud want to withdraw the EBT funds before the victim accountholder has an opportunity to legitimately withdraw the EBT funds.

15.    I know from training and experience, my knowledge of this investigation, and in talking to other law enforcement officers, and reviewing records from California DSS, that certain ATMs in the East Bay have been regularly targeted by individuals engaging in suspected EBT access device fraud and cash-out schemes. These ATMs have typically been targeted in the hours after 6:00 a.m. Each month, the California Department of Social Services (CA DSS) generates a report of suspected fraudulent EBT transactions, which has helped us establish the pattern of activity employed by groups engaged in suspected EBT fraud schemes.

**Background on Nicu Buzatu**

16.     Nicu **BUZATU** is a Romanian National born September 30, 1967.  The US Government has no record of **BUZATU** ever lawfully applying for legal entry into the United States.  He first became known to US Law Enforcement around March 2024 when he was arrested by the Santa Ana, California police for grand theft and access card grand theft.

17.     Review of **BUZATU's** criminal history shows that he has the following arrests:

a.         March 1, 2024 by the Santa Ana (CA) Police Department for California Penal Code 487(A) (Grand Theft), 484E(B) (Access Card Grand Theft), 530.5(A) (Identity Theft);

b.         June 1, 2024 by Huntington Beach (CA) for California Penal Code 487(A) (Grand Theft) 484I(B) (Alter Access Card Info), 484E(B) (Acquire Access Card 4+ Persons), 502.6(A) (Fraudulent Possession / Use of Scan Device), 530.5(C)(3) (Acquired ID Info with intent to defraud), 530.5(C)(2) (acquire ID info with intent to defraud);

c.         June 14, 2024 by the Westminster (CA) Police Department for California Penal Code 487(A) (Grand Theft), 484E(B) (Acquire access card 4+ person); April 2, 2026 San Francisco (CA) Police Department for California Penal Code 530.5(A) (get credit /etc, use other ID), 484F(A) Forge access card to defraud), 502.6(A) Fraudulent possession / use of scan device), 487(A) (Grand Theft), 182(A)(1) (Conspiracy to commit crime), 466 (Possession of burglary tools, 487(A) (Grand theft), 484E(B) (Grand theft of access cards).

6

**Background of Investigation into BUZATU**

18.     Since 2022, FBI San Francisco has been investigating conspiracies to defraud victims of their government benefits in the San Francisco Bay Area.  The investigation involves regular coordination with federal, state and local partners, including the US Department of Agriculture – Office of the Inspector General (USDA-OIG), the US Department of State, Bureau of Diplomatic Security (DSS) and other federal, state and local agencies.  During the course of this investigation, members of law enforcement obtained surveillance records related to suspected cash-out events in California.

19.     During a Law Enforcement surveillance operation on or about May 7, 2025 designed to identify individuals engaged in EBT fraud, a (then) juvenile male, Ion Italianu Cimpeanu (CIMPEANU) was observed conducting ATM cash outs in San Lorenzo, CA.  Later that day, agents determined that he was traveling in the same vehicle as an older male subsequently identified as Nicu **BUZATU**.  Based on a review of law enforcement records, I and other agents have assessed that CIMPEANU is **BUZATU's** son.

20.     Further investigation revealed that between August 2025 and March 2026, **BUZATU** engaged in a scheme to fraudulently withdraw funds from California Electronic Benefit Transfer (EBT) accounts at multiple automated teller machines (ATMs) located in the Northern District of California, specifically in Alameda County.  Over the course of the scheme, it is assessed that **BUZATU** and a known co-conspirator worked in concert to cash out approximately $68,780 out of an attempted $70,740, using dozens of unique California EBT accounts belonging to other individuals.

21.     For example, between August 1, 2025, and August 2, 2025, **BUZATU** conducted fraudulent EBT transactions at Wells Fargo ATMs located at 16000 Hesperian Blvd, San

7

Lorenzo, CA.  In surveillance footage from the Wells Fargo ATM on August 1, 2025, law enforcement observed **BUZATU** conducting transactions at the ATM. The surveillance video footage only captures a portion of his activity, however during the time at which he was believed to be standing at the ATM, a total of $23,430 was successfully withdrawn from 41 unique California EBT accounts out of an attempted $24,890, according to ATM records, bank records and EBT transactions examined by law enforcement.  Law enforcement identified **BUZATU** as the individual in the surveillance video by comparing the videos to known images of **BUZATU**, such as booking photos from his previous arrests as well as from identification from agents who have observed **BUZATU** in person. **BUZATU** also at times wears distinctive clothing, including eye glasses and Hawaiian style shirts.

22.     The following day, August 2, 2025, **BUZATU** was again captured on ATM surveillance video at the same Wells Fargo ATM location, where an additional $19,110 was successfully withdrawn from 22 unique California EBT accounts.  CIMPEANU was also observed via ATM surveillance conducting transactions at a Citibank ATM located at 429 Paseo Grande, San Lorenzo, California on both August 1 and August 2, 2025, successfully withdrawing a combined $4,140 from multiple EBT accounts during those dates.

23.     On or about January 1 and January 2, 2026, **BUZATU** resumed fraudulent EBT activity in the San Francisco Bay Area.  On January 1, 2026, **BUZATU** was observed on ATM surveillance at the Wells Fargo ATM at 16000 Hesperian Blvd, San Lorenzo, CA conducting transactions during two separate time windows, successfully withdrawing $8,400 from 12 unique California EBT accounts.  On January 2, 2026, **BUZATU** was again captured on ATM surveillance video conducting fraudulent transactions at two additional Wells Fargo locations, at 16000 Hesperian Blvd, San Lorenzo, CA where $4,370 was successfully withdrawn from 5

unique EBT accounts; and 1172 A Street, Hayward, California, where an additional $3,330 was successfully withdrawn from 4 unique EBT accounts.



The above images depicts **BUZATU** utilizing an ATM at Wells Fargo at 1172 A Street, Hayward, CA to conduct fraudulent ATM withdrawals on January 2, 2026. I recognized the videos to be of **BUZATU** because I have observed him in person multiple times.

24.    On or about March 3, 2026, **BUZATU** conducted fraudulent EBT transactions at multiple ATM locations in Hayward, CA.  **BUZATU** was observed on ATM surveillance at a BMO ATM located at 24299 Southland Drive, Hayward, CA. During two separate time windows, **BUZATU** successfully withdrew a combined $2,410 from 8 unique California EBT accounts.  **BUZATU** was also observed, via surveillance footage, at a Wells Fargo ATM located at 950 Southland Drive, Hayward CA, successfully withdrawing $3,590 from 4 unique California EBT accounts.

9



The above depicts **BUZATU** utilizing the ATM at BMO Bank at 24299 Southland Drive,

Hayward, CA March 3, 2026.



**BUZATU** utilizing the ATM at Wells Fargo on March 3, 2026

25. On June 2, 2026, while conducting surveillance of a known co-conspirator of **BUZATU** at ATMs located at a Wells Fargo branch at 2595 Mission Street, San Francisco, CA, I personally observed **BUZATU** accessing an ATM for a long duration of time.  I know

10

based on my training and experience that subjects conducting ATM skimming / cash outs will sometimes spend an unusually long amount of time at a single ATM, utilizing different ATM cards to either conduct balance inquiries on multiple accounts for theft later, or to access multiple accounts in succession in an attempt to withdraw the funds currently available in those accounts. Data obtained by a USDA-OIG agent from EBTEdge, showed that on June 2, 2026, between approximately 12:04 PM and 12:25 PM, approximately 80 balance inquiries utilizing approximately 72 unique EBT card numbers were conducted at this Wells Fargo ATM location.  EBTEdge is a database that contains EBT transaction data.



Date: 06/02/2026 12:24:01.14
Camera: 11.C11 ATM 0064A Customer
Event: 0064A
DVR: AU000006422ndAndMission

The above image depicts **BUZATU** utilizing the ATM at Wells Fargo located at 2595 Mission St., San Francisco, CA on June 2, 2026, during the time period of the fraudulent EBT activity at this ATM.

### **CONCLUSION**

25.     Based on the foregoing, probable cause exists to believe that on or about January 1, 2026, in the Northern District of California, Nicu **BUZATU** was engaged in the unauthorized use of access devices to fraudulently obtain something of value in excess of $1,000 in a one-year period, in a way that affected interstate commerce, all in violation of  Title 18, United States Code, Section 1029(a)(2).

26.     Accordingly, I respectfully request that a complaint and a warrant for the arrest of Nicu **BUZATU** be issued.

Respectfully Submitted,

*/s/ Taylor C. Frechette*

_____
Taylor C. Frechette
Special Agent
Diplomatic Security Service

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this 16th day of June, 2026.

_____
HONORABLE ROBERT M. ILLMAN
United States Magistrate Judge